JOSEPH E. SOPER, and another,

*vs.*

JAMES E. CREIGHTON, and others.

Knox.     Opinion January 12, 1900.

*Sales. Delivery. Prompt Shipment.*

Plaintiffs are merchants in Boston; defendants, traders in Thomaston. A sales-
man of the plaintiffs sold defendants goods " to be shipped prompt." *Held;*
that this means shipped from Boston so that the goods would arrive in Thom-
aston by reasonable dispatch; and, unless so shipped, the title to the goods
would not pass to the defendants, and when not so received by them they are
not liable for damages upon their contract of purchase.

ON REPORT.

This was an action for damages for the non-acceptance by the
defendants of a car of feed which the plaintiffs allege they sold
the defendants through their agent, Raymond O'Brien, and which
the defendants refused to accept on account of the long and unrea-
sonable delay in the delivery.   No claim of delivery, or acceptance
of any part, or any payment by the defendants was made on
account of the feed.   The declaration was framed not for goods
sold and delivered, but for damages for non-acceptance of goods
bargained and sold.

The material facts are as follows:—

The plaintiffs carry on business in Boston under the name,
"J. E. Soper & Co. Cotton Seed Meal, Grain and Feed, 207 Cham-
ber of Commerce." They are not brokers but dealers. The defend-
ants carry on a lime manufacturing business in Thomaston, Maine,
and a general store in connection with it, and sell grain and feed
among other articles.

Raymond O'Brien, a native and resident of Warren, near Thom-
aston, and whose postoffice address was Thomaston, represented the
plaintiffs as their agent or salesman. He was well acquainted
with the defendants and was often in Thomaston, but had not pre-

viously made sales to the defendants, they buying their grain and feed in Portland.

The last of April, 1898, the defendants were out of a necessary supply of feed, and could not get any in Portland, where they usually dealt, without delay of ten days or two weeks, which they could not grant for they wanted it at once. Charles A. Creighton, one of the defendants, met O'Brien in the postoffice, at Thomaston, and inquired if he could furnish them a car of feed, and whether they had any at Yarmouth or not;—Creighton placing his stress on an immediate delivery, and whether O'Brien could give it. O'Brien said he could not, and Creighton said, then that ends it, for we don't want it unless we can have it "spot" "at once," etc.

Both agree that Creighton said he would try Littlehale of Rockland, which he says he did and could not get it; and then O'Brien came along and hailed him, and told Creighton he "could supply him with that feed," and the time of delivery was repeated, but not so emphatically as before, as O'Brien knew his wishes and testified: "He said to hurry it; he asked me to have them hurry it, or rush it, as he was in a hurry for it." Under O'Brien's assurance that his house could furnish it, Creighton ordered the car of feed with the understanding it should be delivered in a few days.

O'Brien, carrying out the direction to "rush it" and haste, at once wired his house in Boston and followed it by a letter. The telegram is not produced but the letter directs if they are not "able to fill the order, please advise" defendants. The defendants got no notice of shipment and assumed the order was filled and expected it daily and went to the railroad station for it.

The plaintiffs, however, it seems, were not able to fill the order and instead of notifying the defendants went to the broker's board, and bought it of Chapin & Co. for shipment from some point. One of the plaintiffs testifies: "We immediately sent the instructions west to be filled promptly upon the date it was taken," but he afterwards says, "the party of whom they bought sent the order west; they really had nothing further to do with it." It was

bought on the broker's board in Boston May 5, and the plaintiffs claim, was shipped from Seymour, Indiana, May 10, but ordered out before the plaintiffs bought it.   So it was not shipped on this order, but was bought in some indefinite place not known to either of these parties, or Chapin & Co., and may have been stalled some-where when bought.   The plaintiffs claim by bill of lading that it left Seymour, Indiana, May 10, 1898, but it does not appear by that document that it was for defendants, and they claimed that the order could not have reached there; it also shows that the car was subject to the order of Chapin & Co. and with directions to hold at Norwood, N. Y., for orders.   By indorsement on the back of bill of lading Chapin & Co.'s order was made June 1, 1898. By the way-bill it appears that the car was at Detroit May 27, and at Norwood June 2.   It was a month before it arrived at Norwood, the point where its destination was determined.

The plaintiffs sent to the defendants on May 5, a printed blank filled up, which they call a confirmation, containing words, "ship-ment prompt."   Charles A. Creighton, who had the talk with O'Brien, went away a few days after and did not see the confirma-tion.   John M. Creighton another defendant did see it, and con-struing it to insure the immediate receipt of the feed, made no reply to it.   On June 20, long after the feed had arrived and acceptance refused, a copy was also sent to the defendants..

The defendants went daily to the station for the feed.   It did not arrive and on May 26th, in the absence of C. A. Creighton, J. M. Creighton wrote the plaintiffs, "we bought cargo of feed to come right along" and on June 4, C. A. Creighton having returned, wrote, "we bought cargo of feed to be delivered at once" and get-ting no feed, on June 7th, he wired:   "O'Brien sold prompt delivery, will not accept feed."

. The confirmation sent by the plaintiffs was never acknowledged or referred to. by defendants.   It was a printed blank circular with only a few written words, and would not attract the attention of a party unless, perhaps, the word "prompt" which would be in accordance with the defendants' wish.

The defendants claimed that there was no car shipped, from Sey-

mour, Indiana, for Thomaston, or for these plaintiffs, and so could not have been shipped prompt, or within ten days; and refused acceptance. Thereupon the plaintiffs, after notice to the defendants, resold the feed at a loss of $54.00.

*R. I. Thompson*, for plaintiffs.

Statute of frauds: *Bauman* v. *James*, 3 Ch. 503; *Cave* v. *Hastings*, 7, Q. B. D. 125, (42 Am. Rep. 347, note); *Kingsley* v. *Siebrecht*, 92 Maine, 23; *Long* v. *Millar*, 41 L. T. Rep. (N. S.) 306; Browne Stat. Frauds, § 348; Benj. Sales, §§ 222, a, 252, (Bennett's 4th Am. Ed); *Ryan* v. *U. S.* 136, U. S. 68; *Freeland* v. *Ritz*, 154 Mass. 259; *Beckwith* v. *Talbot*, 95 U. S. 289; *Williams* v. *Robinson*, 73 Maine, 186; *Townsend* v. *Hargraves*, 118 Mass. 325, and cases.

Whether the contract was that the feed was "to be shipped prompt," as plaintiffs contend, or whether it was to be prompt delivery as defendants contend, the defendants are estopped by their three weeks silence after reading the terms of the contract as written by the plaintiffs; and whatever doubt there might be or may have been, had there been no written evidence in the case as to whether it was shipment or delivery that was meant, must, under all circumstances, be resolved in favor of the plaintiffs.

The defendants must have understood the word "shipment" in its ordinary sense. They are manufacturers of lime and are accustomed to shipments of large quantities of it; and as intelligent men know the meaning of the word "shipment" and knew when they bought this car of feed the full meaning of the words as written. Defendant John Creighton, as a dealer in lime, well knows the difference between "shipment" and "delivery".

The words "to be shipped prompt" have no technical legal meaning like the word "delivery", and the ordinary meaning of "shipped" all business men must be presumed to understand in its ordinary sense.

This car of feed was shipped within the contract time and was delivered to the B. & O. R. R. Co. as per bill of lading, which in contemplation of law is a delivery to these defendants. Benj. on Sales (Bennett's 4th. Am. Ed.) §§ 181, 693, and cases; *Tyler* v.

*Augusta*, 88 Maine, 504.    But delivery is not always essential to the validity of a sale.    *Cummings* v. *Gilman*, 90 Maine, 524.

*J. E. Moore*, for defendants.

(1.)   Stat. of frauds:   *Riley* v. *Farnsworth*, 116 Mass. 223, 225–6, cited in *Williams* v. *Robinson*, 73 Maine, 195 ; *O'Donnell* v. *Leeman*, 43 Maine, 159 ; *Washington Ice Co.* v. *Webster*, 62 Maine, 341.

But suppose the confirmation could be connected by implication, still there would not be a completed contract or memorandum of one, for the letters of the defendants state the time of delivery differently from what the blank does.   Defendants say " delivery " and the confirmation says "shipment."

The confirmation sent may have been a quiet attempt to change the oral agreement made by O'Brien, for he says, that defendants "said to hurry it; he asked me to have the house hurry it, or rush it, as he was in a hurry for it."   This certainly confirms the defendants' statement of what delivery was to be and throws light upon the whole matter.   There is a conflict between the " confirmation " and the letter of defendants on question of delivery, and so there could not have been any contract according to the requirements as stated in the authorities cited, supra.

There is no price or terms of payment stated in either of defendants letters or telegram.   These three (two letters and a telegram) are all the memoranda in writing, signed by the defendants, and which plaintiffs claim do not correctly state the contract and these do not contain all the essential elements of a bargain.

Plaintiffs say prompt shipment means ten days from the date of the contract (though not meaning this to defendants) and claim that the way-bill shows this was shipped on May 10, within five days.   The facts do not bear this out.   The bill of lading was to Chapin & Co.   Its destination was determined when it arrived at Norwood, N. Y., and Creighton & Co. and Thomaston, did not appear on it till then, if it did even at that time.   So the first that appears to show when this car of feed was shipped to defendants was June 1, 1898.   Up to this time no car had been assigned to

defendants, and the testimony all through shows that the plaintiffs knew nothing about it; so in fact and law the shipment on this contract was from Norwood, N. Y., which was June 1.

(2) The shipment was not prompt and the delay was unreasonable. It may be said that the contract was not reduced to writing in its entirety. So far as time of delivery was concerned it was expressed in the letters. In *Neal* v. *Flint*, 88 Maine, 72, it is held that the situation of the parties and circumstances under which the contract was made, etc., are admissible in certain cases. Counsel also cited *Rhoades* v. *Cotton*, 90 Maine, 453; *Fisher* v. *Boynton*, 87 Maine, 395.

The plaintiffs, in this case, as they testify, didn't even attend to the shipping, but simply left an order with a broker, and he did all that was done.

SITTING: EMERY, HASKELL, WISWELL, STROUT, SAVAGE, FOGLER, JJ.

HASKELL, J. Plaintiffs are merchants in Boston; defendants traders in Thomaston. May 4th O'Brien, a salesman of plaintiffs, sold defendants a car of feed, to be shipped at once. May 5th plaintiffs wrote defendants, " We have this day sold you one car Blish Milling Co. at $17.75 mixed feed 100 lbs. B. Pts. To be shipped prompt." May 26th defendants wrote plaintiffs, " We bought a car of feed to come right along. That was some four weeks ago, but it is not here yet. We have been looking for it all this time and its not coming has hurt our business very much. If it is not near here shall have to give it up and order elsewhere." Again June 4th defendants wrote plaintiffs, " We bought a car of feed of you, through your Mr. O'Brien, May 5th, to be delivered at once. Now it has not arrived yet, and we have lost the sale of a car of feed, and it is so late in the season that we shall not want it. You will please cancel the order as we will not be able to receive it."

The contract contemplated the prompt delivery by plaintiffs on board carrier, at Boston or vicinity, merchandise consigned to

defendants. Upon such delivery the title to the goods would have passed to defendants. Without such delivery the title would not pass, except by defendants' consent. Such delivery was never made. Plaintiffs never shipped the merchandise from Boston or vicinity, where prompt delivery would insure prompt receipt of the goods by the purchasers, as contemplated by the contract of sale. The delay was unreasonable. The defendants might well cancel their order, or, which is the same thing, refuse to receive the goods not shipped for a month after they should have been. Plaintiffs had no right to sell defendants goods to be shipped promptly, presumably from their warehouse or store in Boston, and compel defendants to await their arrival from the west, with delay of perhaps a month in transit.

Had plaintiffs sold the goods to be delivered in Thomaston, they might have shipped them from the four corners of the universe, had they seasonably delivered them, and they would have become the defendants' goods.

The title to the goods did not pass to defendants, nor were the goods seasonably shipped under the contract of sale so as to enable plaintiffs to have damages. They did not mind the contract themselves and defendants need not. *Rhoades* v. *Cotton*, 90 Maine, 453.

*Judgment for defendants.*